*72 Justice Stevens
delivered the opinion of the Court.
Respondents, who have for over 15 years smoked “light” cigarettes manufactured by petitioners, Philip Morris USA, Inc., and its parent company, Altria Group, Inc., claim that petitioners violated the Maine Unfair Trade Practices Act *73 (MUTPA). Specifically, they allege that petitioners’ advertising fraudulently conveyed the message that their “light” cigarettes deliver less tar and nicotine to consumers than regular brands despite petitioners’ knowledge that the message was untrue. Petitioners deny the charge, asserting that their advertisements were factually accurate. The merits of the dispute are not before us because the District Court entered summary judgment in favor of petitioners on the ground that respondents’ state-law claim is pre-empted by the Federal Cigarette Labeling and Advertising Act, as amended (Labeling Act or Act). The Court of Appeals reversed that judgment, and we granted certiorari to review its holding that the Labeling Act neither expressly nor impliedly pre-empts respondents’ fraud claim. We affirm.
I
Respondents are Maine residents and longtime smokers of Marlboro Lights and Cambridge Lights cigarettes, which are manufactured by petitioners. Invoking the diversity jurisdiction of the Federal District Court, respondents filed a complaint alleging that petitioners deliberately deceived them about the true and harmful nature of “light” cigarettes in violation of the MUTPA, Me. Rev. Stat. Ann., Tit. 5, § 207 (Supp. 2008).[1] Respondents claim that petitioners fraudulently marketed their cigarettes as being “light” and containing “ ‘[Lowered [t]ar and [njicotine’ ” to convey to consumers that they deliver less tar and nicotine and are therefore less harmful than regular cigarettes. App. 28a-29a.
*74 Respondents acknowledge that testing pursuant to the Cambridge Filter Method[2] indicates that tar and nicotine yields of Marlboro Lights and Cambridge Lights are lower than those of regular cigarettes. Id., at 30a. Respondents allege, however, that petitioners have known at all relevant times that human smokers unconsciously engage in compensatory behaviors not registered by Cambridge Filter Method testing that negate the effect of the tar- and nicotine-reducing features of “light” cigarettes. Id., at 30a-31a. By covering filter ventilation holes with their lips or fingers, taking larger or more frequent puffs, and holding the smoke in their lungs for a longer period of time, smokers of “light” cigarettes unknowingly inhale as much tar and nicotine as do smokers of regular cigarettes. Ibid. “Light” cigarettes are in fact more harmful because the increased ventilation that results from their unique design features produces smoke that is more mutagenic per milligram of tar than the smoke of regular cigarettes. Id., at 31a-32a. Respondents claim that petitioners violated the MUTPA by fraudulently concealing that information and by affirmatively representing, through the use of “light” and “lowered tar and nicotine” descriptors, that their cigarettes would pose fewer health risks. Id., at 32a, 33a.
Petitioners moved for summary judgment on the ground that the Labeling Act, 15 U. S. C. § 1334(b), expressly preempts respondents’ state-law cause of action. Relying on our decisions in Cipollone v. Liggett Group, Inc., 505 U. S. 504 (1992), and Lorillard Tobacco Co. v. Reilly, 533 U. S. *75 525 (2001), the District Court concluded that respondents’ MUTPA claim is pre-empted. The court recast respondents’ claim as a failure-to-warn or warning neutralization claim of the kind pre-empted in Cipollone: The claim charges petitioners with “produc[ing] a product it knew contained hidden risks . . . not apparent or known to the consumer” — a claim that “runs to what [petitioners] actually said about Lights and what [respondents] claim they should have said.” 436 F. Supp. 2d 132, 151 (Me. 2006). And the difference between what petitioners said and what respondents would have them say is “ 'intertwined with the concern about cigarette smoking and health.’” Id., at 153 (quoting Reilly, 533 U. S., at 548). The District Court thus concluded that respondents’ claim rests on a state-law requirement based on smoking and health of precisely the kind that § 1334(b) pre-empts, and it granted summary judgment for petitioners.
Respondents appealed, and the Court of Appeals reversed. The Court of Appeals first rejected the District Court’s characterization of respondents’ claim as a warning neutralization claim akin to the pre-empted claim in Cipollone. 501 F. 3d 29, 37, 40 (CA1 2007). Instead, the court concluded that respondents’ claim is in substance a fraud claim that alleges that petitioners falsely represented their cigarettes as “light” or having “lowered tar and nicotine” even though they deliver to smokers the same quantities of those components as do regular cigarettes. Id., at 36. “The fact that these alleged misrepresentations were unaccompanied by additional statements in the nature of a warning does not transform the claimed fraud into failure to warn” or warning neutralization. Id., at 42-43. Finding respondents’ claim indistinguishable from the non-pre-empted fraud claim at issue in Cipollone, the Court of Appeals held that it is not expressly pre-empted. The court also rejected petitioners’ argument that respondents’ claim is impliedly pre-empted because their success on that claim would stand as an obsta *76 cle to the purported policy of the FTC allowing the use of descriptive terms that convey Cambridge Filter Method test results. Accordingly, it reversed the judgment of the District Court.
In concluding that respondents’ claim is not expressly preempted, the Court of Appeals considered and rejected the Fifth Circuit’s reasoning in a similar case. 501 F. 3d, at 45. Unlike the court below, the Fifth Circuit likened the plaintiffs’ challenge to the use of “light” descriptors to Cipollone’s warning neutralization claim and thus found it expressly pre-empted. Brown v. Brown & Williamson Tobacco Corp., 479 F. 3d 383, 392-393 (2007). We granted the petition for certiorari to resolve this apparent conflict. 552 U. S. 1162 (2008).
II
Article VI, cl. 2, of the Constitution provides that the laws of the United States “shall be the supreme Law of the Land;... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.” Consistent with that command, we have long recognized that state laws that conflict with federal law are “without effect.” Maryland v. Louisiana, 451 U. S. 725, 746 (1981).
Our inquiry into the scope of a statute’s pre-emptive effect is guided by the rule that “‘[t]he purpose of Congress is the ultimate touchstone’ in every pre-emption case.” Medtronic, Inc. v. Lohr, 518 U. S. 470, 485 (1996) (quoting Retail Clerks v. Schermerhorn, 375 U. S. 96, 103 (1963)). Congress may indicate pre-emptive intent through a statute’s express language or through its structure and purpose. See Jones v. Rath Packing Co., 430 U. S. 519, 525 (1977). If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress’ displacement of state law still remains. Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual *77 conflict between state and federal law. Freightliner Corp. v. Myrick, 514 U. S. 280, 287 (1995).
When addressing questions of express or implied preemption, we begin our analysis “with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.” Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230 (1947). That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. Lohr, 518 U. S., at 485; see also Reilly, 533 U. S., at 541-542 (“Because ‘federal law is said to bar state action in [a] fiel[d] of traditional state regulation,’ namely, advertising, we ‘wor[k] on the assumption that the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress’” (citation omitted)). Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily “accept the reading that disfavors pre-emption.” Bates v. Dow Agrosciences LLC, 544 U. S. 431, 449 (2005).
Congress enacted the Labeling Act in 1965[3] in response to the Surgeon General’s determination that cigarette smoking is harmful to health. The Act required that every package of cigarettes sold in the United States contain a conspicuous warning, and it pre-empted state-law positive enactments that added to the federally prescribed warning. 79 Stat. 283. Congress amended the Labeling Act a few years later by enacting the Public Health Cigarette Smoking Act of 1969.[4] The amendments strengthened the language of the prescribed warning, 84 Stat. 88, and prohibited cigarette advertising in “any medium of electronic communication subject to [Federal Communications Commission] jurisdiction,” id., at 89. They also broadened the Labeling Act’s pre *78 emption provision. See Cipollone, 505 U. S., at 520 (plurality opinion) (discussing the difference in scope of the pre-' emption clauses of the 1965 and 1969 Acts). The Labeling Act has since been amended further to require cigarette manufacturers to include four more explicit warnings in their packaging and advertisements on a rotating basis.[5]
The stated purpose of the Labeling Act is
“to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—
“(1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and
“(2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.” 79 Stat. 282, 15 U. S. C. § 1331.
The requirement that cigarette manufacturers include in their packaging and advertising the precise warnings mandated by Congress furthers the Act’s first purpose. And the Act’s pre-emption provisions promote its second purpose.
As amended, the Labeling Act contains two express preemption provisions. Section 5(a) protects cigarette manufacturers from inconsistent state labeling laws by prohibiting the requirement of additional statements relating to smoking and health on cigarette packages. 15 U. S. C. § 1334(a). Section 5(b), which is at issue in this case, provides that “[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the adver *79 tising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.” § 1334(b).
Together, the labeling requirement and pre-emption provisions express Congress’ determination that the prescribed federal warnings are both necessary and sufficient to achieve its purpose of informing the public of the health consequences of smoking. Because Congress has decided that no additional warning statement is needed to attain that goal, States may not impede commerce in cigarettes by enforcing rules that are based on an assumption that the federal warnings are inadequate. Although both of the Act’s purposes are furthered by prohibiting States from supplementing the federally prescribed warning, neither would be served by limiting the States’ authority to prohibit deceptive statements in cigarette advertising. Petitioners acknowledge that “Congress had no intention of insulating tobacco companies from liability for inaccurate statements about the relationship between smoking and health.” Brief for Petitioners 28. But they maintain that Congress could not have intended to permit the enforcement of state fraud rules because doing so would defeat the Labeling Act’s purpose of preventing nonuniform state warning requirements. 15 U. S. C. § 1331.[6] As we observed in Cipollone, however, *80 fraud claims “rely only on a single, uniform standard: falsity.” 505 U. S., at 529 (plurality opinion).
Although it is clear that fidelity to the Act’s purposes does not demand the pre-emption of state fraud rules, the principal question that we must decide is whether the text of § 1334(b) nevertheless requires that result.
Ill
We have construed the operative phrases of § 1334(b) in two prior cases: Cipollone, 505 U. S. 504, and Reilly, 533 U. S. 525. On both occasions we recognized that the phrase “based on smoking and health” modifies the state-law rule at issue rather than a particular application of that rule.
In Cipollone, the plurality, which consisted of Chief Justice Rehnquist and Justices White, O’Connor, and Stevens, read the pre-emption provision in the 1969 amendments to the Labeling Act to pre-empt common-law rules as well as positive enactments. Unlike Justices Blackmun, Kennedy, and Souter, the plurality concluded that the provision does not preclude all common-law claims that have some relationship to smoking and health. 505 U. S., at 521-523. To determine whether a particular common-law claim is preempted, the plurality inquired “whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health . . . with respect to . . . advertising or promotion,’ giving that clause a fair but narrow reading.” Id., at 524.
*81 Applying this standard, the plurality held that the plaintiff’s claim that cigarette manufacturers had fraudulently misrepresented and concealed a material fact was not preempted. That claim alleged a violation of the manufacturers’ duty not to deceive — a duty that is not “based on” smoking and health. Id., at 528-529. Respondents in this case also allege a violation of the duty not to deceive as that duty is codified in the MUTPA. The duty codified in that state statute, like the duty imposed by the state common-law rule at issue in Cipollone, has nothing to do with smoking and health.[7]
Petitioners endeavor to distance themselves from that holding by arguing that respondents’ claim is more analogous to the “warning neutralization” claim found to be pre-empted in Cipollone. Although the plurality understood the plaintiff to have presented that claim as a “theory of fraudulent misrepresentation,” id., at 528, the gravamen of the claim was the defendants’ failure to warn, as it was “predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking,” id., at 527. Thus understood, the Cipollone plurality’s analysis of the warning neutralization claim has no application in this case.[8]
*82 Petitioners nonetheless contend that respondents’ claim is like the pre-empted warning neutralization claim because it is based on statements that “might create a false impression” rather than statements that are “inherently false.” Brief for Petitioners 39. But the extent of the falsehood alleged does not alter the nature of the claim. Nothing in the Labeling Act’s text or purpose or in the plurality opinion in Cipollone suggests that whether a claim is pre-empted turns in any way on the distinction between misleading and inherently false statements. Petitioners’ misunderstanding is the same one that led the Court of Appeals for the Fifth Circuit, when confronted with a “light” descriptors claim, to reach a result at odds with the Court of Appeals’ decision in this case. See Brown, 479 F. 3d, at 391-393. Certainly, the extent of the falsehood alleged may bear on whether a plaintiff can prove her fraud claim, but the merits of respondents’ claim are not before us.
Once that erroneous distinction is set aside, it is clear that our holding in Cipollone that the common-law fraud claim was not pre-empted is directly applicable to the statutory claim at issue in this case. As was true of the claim in Cipollone, respondents’ claim that the deceptive statements “light” and “lowered tar and nicotine” induced them to purchase petitioners’ product alleges a breach of the duty not to deceive.[9] To be sure, the presence of the federally mandated warnings may bear on the materiality of petitioners’ *83 allegedly fraudulent statements, “but that possibility does not change [respondents’] case from one about the statements into one about the warnings.” 501 E 3d, at 44.[10]
Our decision in Reilly is consistent with Cipollone’s analysis. Reilly involved regulations promulgated by the Massachusetts attorney general “ ‘in order to address the incidence of cigarette smoking and smokeless tobacco use by children under legal age . . . [and] in order to prevent access to such products by underage consumers.’ ” 533 U. S., at 533 (quoting 940 Code Mass. Regs. §21.01 (2000)). The regulations did not pertain to the content of any advertising; rather, they placed a variety of restrictions on certain cigarette sales and the location of outdoor and point-of-sale cigarette advertising. The attorney general promulgated those restrictions pursuant to his statutory authority to prevent unfair or deceptive trade practices. Mass. Gen. Laws, ch. 93A, § 2 (West 1996). But although the attorney general’s authority derived from a general deceptive practices statute like the one at issue in this case, the challenged regulations targeted advertising that tended to promote tobacco use by children instead of prohibiting false or misleading statements. Thus, whereas the “prohibition” in Cipollone was the common-law fraud rule, the “prohibitions” in Reilly were the targeted regulations. Accordingly, our holding in Reilly that the reg *84 ulations were pre-empted provides no support for an argument that a general prohibition of deceptive practices is “based on” the harm caused by the specific kind of deception to which the prohibition is applied in a given case.
It is true, as petitioners argue, that the appeal of their advertising is based on the relationship between smoking and health. And although respondents have expressly repudiated any claim for damages for personal injuries, see App. 26a, their actual injuries likely encompass harms to health as well as the monetary injuries they allege. These arguments are unavailing, however, because the text of § 1334(b) does not refer to harms related to smoking and health. Rather, it pre-empts only requirements and prohibitions— i. e., rules — that are based on smoking and health. The MUTPA says nothing about either “smoking” or “health.” It is a general rule that creates a duty not to deceive and is therefore unlike the regulations at issue in Reilly.[11]
Petitioners argue in the alternative that we should reject the express pre-emption framework established by the Cipollone plurality and relied on by the Court in Reilly. In so doing, they invoke the reasons set forth in the separate opinions of Justice Blackmun (who especially criticized the plurality’s holding that the failure-to-warn claim was preempted) and Justice Scalia (who argued that the fraud claim also should be pre-empted). While we again acknowledge that our analysis of these claims may lack “theoretical elegance,” we remain persuaded that it represents “a fair understanding of congressional purpose.” Cipollone, 505 U. S., at 529-530, n. 27 (plurality opinion).
*85 Petitioners also contend that the plurality opinion is inconsistent with our decisions in American Airlines, Inc. v. Wolens, 513 U. S. 219 (1995), and Riegel v. Medtronic, Inc., 552 U. S. 312 (2008). Both cases, however, are inapposite— the first because it involved a pre-emption provision much broader than the Labeling Act’s, and the second because it involved precisely the type of state rule that Congress had intended to pre-empt.
At issue in Wolens was the pre-emptive effect of the Airline Deregulation Act of 1978 (ADA), 49 U. S. C. App. § 1305(a)(1) (1988 ed.), which prohibits States from enacting or enforcing any law “relating to rates, routes, or services of any air carrier.” The plaintiffs in that case sought to bring a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 111. Comp. Stat., ch. 815, § 505 (West 1992). Our conclusion that the state-law claim was pre-empted turned on the unusual breadth of the ADA’s pre-emption provision. We had previously held that the meaning of the key phrase in the ADA’s pre-emption provision, “ ‘relating to rates, routes, or services,’ ” is a broad one. Morales v. Trans World Airlines, Inc., 504 U. S. 374, 383-384 (1992) (emphasis added). Relying on precedents construing the pre-emptive effect of the same phrase in the Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1144(a), we concluded that the phrase “‘relating to’ ” indicates Congress’ intent to pre-empt a large area of state law to further its purpose of deregulating the airline industry. 504 U. S., at 383-384.[12] Unquestionably, the *86 phrase “relating to” has a broader scope than the Labeling Act’s reference to rules “based on” smoking and health; whereas “relating to” is synonymous with “having a connection with,” id., at 384, “based on” describes a more direct relationship, see Safeco Ins. Co. of America v. Burr, 551 U. S. 47, 63 (2007) (“In common talk, the phrase ‘based on’ indicates a but-for causal relationship and thus a necessary logical condition”).
Petitioners’ reliance on Riegel is similarly misplaced. The plaintiffs in Riegel sought to bring common-law design, manufacturing, and labeling defect claims against the manufacturer of a faulty catheter. The case presented the question whether those claims were expressly pre-empted by the Medical Device Amendments of 1976 (MDA), 21 U. S. C. § 360c et seq. The MDA’s pre-emption clause provides that no State “‘may establish or continue in effect with respect to a device . . . any requirement’ relating to safety or effectiveness that is different from, or in addition to, federal requirements.” Riegel, 552 U. S., at 328 (quoting 21 U. S. C. § 360k(a); emphasis deleted).
The catheter at issue in Riegel had received premarket approval from the Food and Drug Administration (FDA). We concluded that premarket approval imposes “requirement[s] relating to safety [and] effectiveness” because the FDA requires a device that has received premarket approval to be made with almost no design, manufacturing, or labeling deviations from the specifications in its approved application. The plaintiffs’ products liability claims fell within the core of the MDA’s pre-emption provision because they sought to impose different requirements on precisely those aspects of the device that the FDA had approved. Unlike the Cipollone plaintiff’s fraud claim, which fell outside of the Labeling Act’s pre-emptive reach because it did not seek to impose a *87 prohibition “based on smoking and health,” the Riegel plaintiffs’ common-law products liability claims unquestionably sought to enforce “requirement^] relating to safety or effectiveness” under the MDA. That the “relating to” language of the MDA’s pre-emption provision is, like the ADA’s, much broader than the operative language of the Labeling Act provides an additional basis for distinguishing Riegel. Thus, contrary to petitioners’ suggestion, Riegel is entirely consistent with our holding in Cipollone.
In sum, we conclude now, as the plurality did in Cipollone, that “the phrase ‘based on smoking and health’ fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements.” 505 U. S., at 529.
IV
As an alternative to their express pre-emption argument, petitioners contend that respondents’ claim is impliedly preempted because, if allowed to proceed, it would present an obstacle to a longstanding policy of the FTC. According to petitioners, the FTC has for decades promoted the development and consumption of low tar cigarettes and has encouraged consumers to rely on representations of tar and nicotine content based on Cambridge Filter Method testing in choosing among cigarette brands. Even if such a regulatory policy could provide a basis for obstacle pre-emption, petitioners’ description of the FTC’s actions in this regard are inaccurate. The Government itself disavows any policy authorizing the use of “light” and “low tar” descriptors. Brief for United States as Amicus Curiae 16-33.
In 1966, following the publication of the Surgeon General’s report on smoking and health, the FTC issued an industry guidance stating its view that “a factual statement of the tar and nicotine content (expressed in milligrams) of the mainstream smoke from a cigarette,” as measured by Cambridge Filter Method testing, would not violate the FTC Act. App. 478a. The .Commission made clear, however, that the guid *88 anee applied only to factual assertions of tar and nicotine yields and did not invite “collateral representations ... made, expressly or by implication, as. to reduction or elimination of health hazards.” Id., at 479a. A year later, the FTC reiterated its position in a letter to the National Association of Broadcasters. The letter explained that, as a “general rule,” the Commission would not challenge statements of tar and nicotine content when “they are shown to be accurate and fully substantiated by tests conducted in accordance with the [Cambridge Filter Method].” Id., at 368a. In 1970, the FTC considered providing further guidance, proposing a rule that would have required manufacturers to disclose tar and nicotine yields as measured by Cambridge Filter Method testing. 35 Fed. Reg. 12671. The leading cigarette manufacturers responded by submitting a voluntary agreement under which they would disclose tar and nicotine content in their advertising, App. 899a-900a, and the FTC suspended its rulemaking, 36 Fed. Reg. 784 (1971).
Based on these events, petitioners assert that “the FTC has required tobacco companies to disclose tar and nicotine yields in cigarette advertising using a government-mandated testing methodology and has authorized them to use descriptors as shorthand references to those numerical test results.” Brief for Petitioners 2 (emphasis in original). As the foregoing history shows, however, the FTC has in fact never required that cigarette manufacturers disclose tar and nicotine yields, nor has it condoned representations of those yields through the use of “light” or “low tar” descriptors.
Subsequent Commission actions further undermine petitioners’ claim. After the tobacco companies agreed to report tar and nicotine yields as measured by the Cambridge Filter Method, the FTC continued to police cigarette companies’ misleading use of test results. In 1983, the FTC responded to findings that tar and nicotine yields for Barclay cigarettes obtained through Cambridge Filter Method testing were deceptive because the cigarettes in fact delivered *89 disproportionately more tar to smokers than other cigarettes with similar Cambridge Filter Method ratings. 48 Fed. Reg. 15954. And in 1995, the FTC found that a manufacturer’s representation “that consumers will get less tar by smoking ten packs of Carlton brand cigarettes than by smoking a single pack of the other brands” was deceptive even though it was based on the results of Cambridge Filter Method testing. In re American Tobacco Co., 119 F. T. C. 3, 4. The FTC’s conclusion was based on its recognition that, “[i]n truth and in fact, consumers will not necessarily get less tar” due to “such behavior as compensatory smoking.” Ibid.[13]
This history shows that, contrary to petitioners’ suggestion, the FTC has no longstanding policy authorizing collateral representations based on Cambridge Filter Method test results. Rather, the FTC has endeavored to inform consumers of the comparative tar and nicotine content of different cigarette brands and has in some instances prevented misleading representations of Cambridge Filter Method test results. The FTC’s failure to require petitioners to correct their allegedly misleading use of “light” descriptors is not evidence to the contrary; agency nonenforcement of a fed *90 eral statute is not the same as a policy of approval. Cf. Sprietsma v. Mercury Marine, 537 U. S. 51 (2002) (holding that the Coast Guard’s decision not to regulate propeller guards did not impliedly pre-empt petitioner’s tort claims).[14]
More telling are the FTC’s recent statements regarding the use of “light” and “low tar” descriptors. In 1997, the Commission observed that “[t]here are no official definitions for” the terms “ ‘light’ ” and “ ‘low tar,’ ” and it sought comments on whether “there [is] a need for official guidance with respect to the terms” and whether “the descriptors convey implied health claims.” 62 Fed. Reg. 48163. In November 2008, following public notice and comment, the Commission rescinded its 1966 guidance concerning the Cambridge Filter Method. 73 Fed. Reg. 74500. The rescission is a response to “a consensus among the public health and scientific communities that the Cambridge Filter method is sufficiently flawed that statements of tar and nicotine yields as measured by that method are not likely to help consumers make informed decisions.” Id., at 74503. The Commission’s notice of its proposal to rescind the guidance also reiterated the original limits of that guidance, noting that it “only addressed] simple factual statements of tar and nicotine yields. It d[id] not apply to other conduct or express or implied representations, even if they concerned] tar and nicotine yields.” Id., at 40351.
In short, neither the handful of industry guidances and consent orders on which petitioners rely nor the FTC’s inaction with regard to “light” descriptors even arguably justifies the pre-emption of state deceptive practices rules like the MUTPA.
*91 V
We conclude, as we did in Cipollone, that the Labeling Act does not pre-empt state-law claims like respondents’ that are predicated on the duty not to deceive. We also hold that the FTC’s various decisions with respect to statements of tar and nicotine content do not impliedly pre-empt respondents’ claim. Respondents still must prove that petitioners’ use of “light” and “lowered tar” descriptors in fact violated the state deceptive practices statute, but neither the Labeling Act’s pre-emption provision nor the FTC’s actions in this field prevent a jury from considering that claim. Accordingly, the judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 The MUTPA provides, as relevant, that “[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.” §207. In construing that section, courts are to “be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 45(a)(1) of the Federal Trade Commission Act (15 United States Code 45(a)(1)), as from time to time amended.” §207(1).

 The Cambridge Filter Method weighs and measures the tar and nicotine collected by a smoking machine that takes 35 milliliter puffs of two seconds’ duration every 60 seconds until the cigarette is smoked to a specified butt length. App. 294a, 668a. As discussed below, the Federal Trade Commission (FTC or Commission) signaled in 1966 that the Cambridge Filter Method was an acceptable means of measuring the tar and nicotine content of cigarettes, but it never required manufacturers to publish test results in their advertisements.

 79 Stat. 282.

 Pub. L. 91-222, 84 Stat. 87. Though actually enacted in 1970, Congress directed that it be cited as a “1969 Act.”

 Comprehensive Smoking Education Act, Pub. L. 98-474, §4(a), 98 Stat. 2201,15 U. S. C. § 1333(a).

 Petitioners also urge us to find support for their claim that Congress gave the FTC exclusive authority to police deceptive health-related claims in cigarette advertising in what they refer to as the Labeling Act’s “saving clause.” The clause provides that, apart from the warning requirement, nothing in the Act “shall be construed to limit, restrict, expand, or otherwise affect the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practices in the advertising of cigarettes.” § 1336. A plurality of this Court has previously read this clause to “indicate] that Congress intended the phrase ‘relating to smoking and health’... to be construed narrowly, so as not to proscribe the regulation of deceptive advertising.” Cipollone v. Liggett Group, Inc., 505 U. S. 504, 528-529 (1992). Nothing in the clause suggests that Congress meant to proscribe the States’ historic regulation of deceptive advertising prac *80 tices. The FTC has long depended on cooperative state regulation to achieve its mission because, although one of the smallest administrative agencies, it is charged with policing an enormous amount of activity. See 1 S. Kanwit, Federal Trade Commission §§1:1, 1:2 (2004 ed. and Supp. 2008). Moreover, when the Labeling Act was amended in 1969 it was not even clear that the FTC possessed rulemaking authority, see 84 Stat. 89, making it highly unlikely that Congress would have intended to assign exclusively to the FTC the substantial task of overseeing deceptive practices in cigarette advertisements.

 In his dissent, Justice Thomas criticizes our reliance on the plurality opinion in Cipollone, post, at 96-98, 103-108, 111-112, and advocates adopting the analysis set forth by Justice Scalia in his opinion concurring in the judgment in part and dissenting in part in that case, post, at 95-96, 109-110. But Justice Scalia’s approach was rejected by seven Members of the Court, and in the almost 17 years since Cipollone was decided Congress has done nothing to indicate its approval of that approach. Moreover, Justice Thomas fails to explain why Congress would have intended the result that Justice Scalia’s approach would produce— namely, permitting cigarette manufacturers to engage in fraudulent advertising. As a majority of the Court concluded in Cipollone, nothing in the Labeling Act’s language or purpose supports that result.

 The Cipollone plurality further stated that the warning neutralization claim was “merely the converse of a state-law requirement that warnings be included in advertising and promotional materials,” 505 U. S., at 527, *82 evincing the plurality’s recognition that warning neutralization and failure-to-warn claims are two sides of the same coin. Justice Thomas’ criticism of the plurality’s treatment of the failure-to-warn claim, post, at 106, is beside the point, as no such claim is at issue in this litigation.

 As the Court of Appeals observed, respondents’ allegations regarding petitioners’ use of the statements “light” and “lowered tar and nicotine” could also support a warning neutralization claim. But respondents did not bring such a claim, and the fact that they could have does not, as petitioners suggest, elevate form over substance. There is nothing new in the recognition that the same conduct might violate multiple proscriptions.

 Justice Thomas contends that respondents’ fraud claim must be pre-empted because “[a] judgment in [their] favor will. .. result in a ‘requirement’ that petitioners represent the effects of smoking on health in a particular way in their advertising and promotion of light cigarettes.” Post, at 93. He further asserts that “respondents seek to require the cigarette manufacturers to provide additional warnings about compensatory behavior, or to prohibit them from selling these products with the ‘light’ or ‘low-tar’ descriptors.” Post, at 109-110. But this mischaracterizes the relief respondents seek. If respondents prevail at trial, petitioners will be prohibited from selling as “light” or “low tar” only those cigarettes that are not actually light and do not actually deliver less tar and nicotine. Barring intervening federal regulation, petitioners would remain free to make nonfraudulent use of the “light” and “low-tar” descriptors.

 In implementing the MUTPA, neither the state legislature nor the state attorney general has enacted a set of special rules or guidelines targeted at cigarette advertising. As we noted in Cipollone, it was the threatened enactment of new state warning requirements rather than the enforcement of pre-existing general prohibitions against deceptive practices that prompted congressional action in 1969. 505 U. S., at 515, and n. 11.

 Petitioners also point to Morales as evidence that our decision in Cipollone was wrong. But Morales predated Cipollone, and it is in any event even more easily distinguishable from this case than American Airlines, Inc. v. Wolens, 513 U. S. 219 (1995). At issue in Morales were guidelines regarding the form and substance of airline fare advertising implemented by the National Association of Attorneys General to give content to state deceptive practices rules. 504 U. S., at 379. Like the regulations at issue in Reilly, the guidelines were industry-specific directives that targeted the subject matter made off-limits by the ADA’s ex *86 press pre-emption provisions. See also Rowe v. New Hampshire Motor Transp. Assn., 552 U. S. 364 (2008) (holding that targeted ground carrier regulations were pre-empted by a statute modeled on the ADA).

 In a different action, the FTC charged a cigarette manufacturer with violating the FTC Act by misleadingly advertising certain brands as “low in tar” even though they had a higher-than-average tar rating. See In re American Brands, Inc., 79 F. T. C. 255 (1971). The Commission and the manufacturer entered a consent order that prevented the manufacturer from making any such representations unless they were accompanied by a clear and conspicuous disclosure of the cigarettes’ tar and nicotine content as measured by the Cambridge Filter Method. Id., at 258. Petitioners offer this consent order as evidence that the FTC authorized the use of “light” and “low tar” descriptors as long as they accurately describe Cambridge Filter Method test results. As the Government observes, however, the decree only enjoined conduct. Brief for United States as Amicus Curiae 26. And a consent order is in any event only binding on the parties to the agreement. For all of these reasons, the consent order does not support the conclusion that respondents’ claim is impliedly pre-empted.

 It seems particularly inappropriate to read a policy of authorization into the FTC’s inaction when that inaction is in part the result of petitioners’ failure to disclose study results showing that Cambridge Filter Method test results do not reflect the amount of tar and nicotine that consumers of “light” cigarettes actually inhale. See id,., at 8-11.